UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STEVEN C. HEISER,

                    Plaintiff,

v.                                    Case No. 3:10-cv-32-J-34MCR


LETICIA RENO, M.D.,
etc.; et al.,

                    Defendants.
_____

**ORDER**

**I. Status**

Plaintiff Steven C. Heiser, an inmate of the Florida penal system proceeding in forma pauperis, initiated this action by filing a pro se Civil Rights Complaint (Doc. #1) under 42 U.S.C. § 1983, Declaration (Doc. #3), Memorandum of Law (Doc. #4), and Appendix (P. Ex.) (Doc. #5) on August 25, 2009, in the United States District Court for the Northern District of Florida.  That court transferred the action to this Court on January 12, 2010. See Order (Doc. #19).

Plaintiff is now proceeding on his November 30, 2009 Amended Complaint (Complaint) (Doc. #14), in which he names the following individuals as Defendants: (1) Dr. Leticia Reno, M.D., a physician; (2) Dr. Paiboon Isra, M.D., a physician; and (3) Dr. James Scott Thayer, M.D., Medical Executive Director, Region II.  Plaintiff asserts that the Defendants' actions violated his federal constitutional rights when they were deliberately indifferent to his serious medical needs relating to the treatment of his right

knee where a Methicillin-resistant Staphylococcus aureus (MRSA) infection developed.  As relief, Plaintiff requests injunctive and declaratory relief as well as compensatory and punitive damages.

This cause is before the Court on Defendants Reno and Isra's Motion to Dismiss or in the Alternative Motion for Summary Judgment (Motion for Summary Judgment) (Doc. #41) with exhibits (Def. Ex.). Since Plaintiff is appearing pro se, the Court advised him of the provisions of Fed. R. Civ. P. 56 and gave him an opportunity to respond to the motion.  See Order of Special Appointment; Directing Service of Process Upon Defendants and Notice to Plaintiff (Doc. #26) (setting forth the provisions of Rule 56 of the Federal Rules of Civil Procedure), filed May 26, 2010.  On October 7, 2011, Plaintiff filed a Traverse Response to Dr. Reno and Dr. Isra's Motion to Dismiss or in the Alternative Motion for Summary Judgment (Plaintiff's Response) (Doc. #44) with exhibits and a supporting declaration (Heiser's Declaration).  This case is now ripe for review.

## II.  Summary Judgment Standard

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information,

- 2 -

affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[1]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  <u>See Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004).  The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  <u>See Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).

---

[1]  Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u>  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Plaintiff's Allegations and Claims

According to Plaintiff, the following incidents transpired from October 24, 2005, through March of 2009 at the Reception and Medical Center (RMC), Main and West Units, Jacksonville Memorial Hospital in Jacksonville, Florida, and Taylor Correctional Institution (TCI).  On Monday, October 24, 2005, Dr. Michael J. Lord, M.D., an orthopedic surgeon, performed arthroscopic surgery on Heiser's right knee.  Complaint at 5.  Following the surgical

procedure, Heiser was transferred from RMC's Main Unit to the West Unit on Monday, October 31, 2005.  <u>Id</u>.

On Friday, November 4, 2005, Heiser experienced an increased and persistent pain in his right knee and observed redness and swelling.  <u>Id</u>.  In compliance with Dr. Lord's post-operative instructions, Heiser immediately declared a medical emergency and was taken to the West Unit's medical facility, where Dr. Reno saw him.  <u>Id</u>. at 5-6.  Heiser requested that Dr. Reno consider Dr. Lord's post-operative instructions and immediately send him to the RMC emergency room for diagnosis and treatment.  <u>Id</u>. at 6. However, Dr. Reno refused Heiser's requests and only provided him with 200 mg Ibuprofen packets and nine (9) capsules of the antibiotic Keflex.  <u>Id</u>.

The following day, Saturday, November 5th, Heiser again declared a medical emergency and was seen by a nurse in the West Unit's medical facility since there was not a physician on duty. <u>Id</u>.  Heiser requested to be sent to the RMC Main Unit emergency room.  <u>Id</u>.  Instead, the nurse called Dr. Isra, the duty physician at the RMC Main Unit emergency room, and then told Heiser that the physician would not see him.  <u>Id</u>.

The next day, Sunday, November 6th, Heiser again declared a medical emergency, and Senior Licensed Practical Nurse Jackie Hinson saw Heiser in the West Unit's medical facility.  <u>Id</u>. at 6-7.

- 5 -

Heiser requested to be sent to RMC's emergency room; however, instead, Nurse Hinson called Dr. Isra, who then authorized her to inject Heiser with a shot of the antibiotic Rocephin. Id. at 7.

On Monday, November 7th, Heiser had a post-surgical examination and consultation with Dr. Lord. Id. Dr. Lord's examination of Heiser "revealed a warm, stiff, swollen right knee." Id. Dr. Lord extracted pus from Heiser's knee, sent the culture to the laboratory, and recommended an incision and drainage (I & D) and debridement of the infected knee. Id. Following Dr. Lord's examination, Heiser was taken to Jacksonville Memorial Hospital later that day for the I & D, and the infection was identified as MRSA. Id. at 8.

Upon being discharged from Jacksonville Memorial Hospital and transferred to the hospital ward of RMC's Main Unit, on November 9th, Heiser received MRSA therapy that consisted of the antibiotic Vancomycin via a peripherally inserted central catheter (known as a picc line), two times per day for twenty-eight days. Id. Heiser was discharged from the institution's hospital and returned to the general population at RMC's Main Unit on or about Thursday, December 8, 2005. Id.

Heiser had a follow-up consultation with Dr. Lord on January 10, 2006, at which time Heiser expressed his concerns that he was experiencing extreme, chronic persistent pain in the knee joint and

was completely unable to walk and that his knee would not bend. Id. Dr. Lord recommended manipulation synovectomy surgery. Id.

On April 10, 2006, Dr. Lord performed the manipulation synovectomy surgery. Id. Despite aggressive physical therapy subsequent to the April 10th surgery, Heiser's right knee eventually stiffened and would not bend at all due to the growth of scar tissue resulting from the damage caused by the MRSA infection. Id. at 9.

On July 11, 2006, Dr. Lord recommended a consultation with Dr. Robert J. Kleinhans, M.D., a specialist with the Jacksonville Orthopedic Institute in Jacksonville, Florida. Id. Dr. Kleinhans, on August 8, 2006, recommended a total knee arthroplasty (TKA). Id. On October 2, 2006, Dr. Kleinhans informed Heiser that he was not able to do the revision due to the destruction and damage of the knee joint caused by the MRSA infection. Id.

Dr. Kleinhans then presented Heiser with three options: (1) leave the knee joint as is; (2) fuse the knee joint; or (3) attempt to perform a special TKA procedure, to include removing a portion of Heiser's femur bone and replacing it with a titanium rod which would be connected to a titanium knee joint. Id. at 10. Hoping to regain the mobility and normal use of the knee joint, Heiser chose the third option. Id. Dr. Kleinhans performed the special TKA on November 16, 2006. Id.

Between the months of March and June of 2007, Heiser had two to three follow-up visits with Dr. Kleinhans.  Id.  During those consultations, Heiser expressed concern that the TKA procedure was not responding with flexion or mobility in the joint and that there was still a considerable amount of pain.  Id.  Dr. Kleinhans then recommended a joint manipulation procedure with anesthesia, but no surgery.  Id.  Dr. Kleinhans performed the joint manipulation procedure on or about July 9, 2007.  Id.  While Dr. Kleinhans ordered immediate physical therapy, that therapy was neither approved nor scheduled until approximately six weeks after the procedure.  Id.

In October of 2007, Heiser had another consultation visit with Dr. Kleinhans and expressed concerns that the July 9th procedure was essentially unsuccessful because the physical therapy had been delayed.  Id. at 11.  At that time, Dr. Kleinhans told Heiser that he would perform joint manipulation synovectomy surgery.  Id.

On February 5, 2008, Heiser submitted an inmate request to the medical department at TCI, inquiring about the status and scheduling of the surgery.  Id.  Nurse Grace Whitaker, on February 11th, responded to the inquiry, indicating that the surgery had been scheduled.  Id.  When Heiser submitted another request to TCI's medical department on April 13th, he was told that the department's medical budget was drastically cut for the fiscal year of 2007-08 and that the surgery "was more than likely cancelled as

a result." Id.  Heiser assumed that Dr. James Scott Thayer, M.D. had made the decision to cancel the surgery.  Id. at 12.

Heiser submitted a correspondence inquiry to the Correctional Medical Authority (CMA) on or about August 18, 2008.  Id.  In January 2009, Dr. Lord told Heiser that there was nothing he could do because he had not performed the TKA replacement.  Id.  On January 6, 2009, Dr. Thayer wrote Heiser, stating in pertinent part: "You are being referred to an orthopedic surgeon and an appointment will be scheduled as soon as an appropriate provider is identified.  This particular problem is not treated by all orthopedic specialists."  P. Ex. X, Letter to Heiser from Dr. Thayer, dated January 6, 2009; Complaint at 12.

On or about February 16, 2009, Heiser submitted another letter to the CMA, expressing concerns that Dr. Thayer had purposely delayed medical treatment for Heiser.  Id.  In March 2009, Heiser had another consultation visit with Dr. Kleinhans, who recommended that Heiser return to the office in two months.  Id. at 13.

### IV. Defendants' Motion for Summary Judgment

Defendants Reno and Isra argue that there is no genuine issue as to any material fact and that each Defendant is entitled to summary judgment as a matter of law based on the record before the Court.  They claim that Plaintiff failed to exhaust his administrative remedies relating to Defendant Isra and failed to state a federal constitutional claim against Defendants Reno and

Isra.   Moreover, Defendants contend that they are entitled to qualified immunity, that Plaintiff is not entitled to compensatory and punitive damages, and that the Eleventh Amendment bars suit against the Defendants insofar as Plaintiff seeks monetary damages from them in their official capacities.

In support of their summary judgment motion, Defendants Reno and Isra submitted their declarations.  See Def. Exs. A (Reno's Declaration); B (Isra's Declaration).  Additionally, in support of their arguments, Defendants rely upon the declarations of Ms. Rebecca Padgham and Dr. Ronald Solorzano-Pallais, M.D.  See Def. Exs. G (Padgham's Declaration); M (Solorzano-Pallais' Declaration).

### V. Law and Conclusions

### A. Exhaustion

Defendants contend that Plaintiff failed to exhaust his administrative remedies with respect to Defendant Isra.   See Defendants' Motion for Summary Judgment at 1, 4-5, 12-14.  This Court has reviewed the relevant grievances submitted by Plaintiff relating to his claims against Defendants Isra and Reno.  See Def. Exs. C-J.

Based on Heiser's allegations in the grievances, it appears that Plaintiff has sufficiently exhausted his claims against Dr. Isra.  See Def. Exs. C-F.  Defendants claim that none of the grievances pertain to any complaints by Heiser regarding either the November 5th or 6th deprivations, see Defendants' Motion for

Summary Judgment at 5, 14; however, Plaintiff's January 28, 2007 grievance contains allegations relating to his November 5th and 6th requests for medical attention.  <u>See</u> Plaintiff's Response at 6; Def. Ex. E,  Log No. 0701-209-052, at 1 ("As a result of the extreme pain I was experiencing in my knee I again claimed an emergency medical condition on Saturday November 5th and Sunday November 6th respectfully.  Again requesting to be sent to the emergency room at RMC Main Unit, to no avail.").

Undoubtedly, Heiser was initially confused as to which physician allegedly denied him treatment on November 4th.  He then corrected his mistake in a later grievance to state that his claim was against Dr. Reno for the November 4th deprivation.[2]   In reviewing the grievances, it appears that Heiser sufficiently exhausted his claims relating to the November 5th and 6th alleged deprivations of medical care and treatment.  Thus, finding that Heiser sufficiently exhausted his administrative grievance remedies with respect to Defendant Isra, this Court will address the merits of Heiser's claims against Defendant Isra.

_____

[2] When Heiser expressed his intention to withdraw his complaints against Dr. Isra, <u>see</u> Def. Ex. F at 2, Heiser was referring to his "inadvertent mistake" in an earlier grievance, <u>see</u> Plaintiff's Response at 5; Def. Ex. C, Log No. 0607-209-013, in naming Dr. Isra, instead of Dr. Reno, as the physician Heiser saw on November 4th.

- 11 -

## B. Eleventh Amendment

Insofar as Plaintiff sues the Defendants in their official capacities, Defendants contend that they are entitled to Eleventh Amendment immunity. "It is well established that a suit against a defendant governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." Manders v. Lee, 285 F.3d 983, 990 (11th Cir. 2002) (citations omitted).

In Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986) (per curium), the Eleventh Circuit noted:

> It is clear that Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits. Quern v. Jordan, 440 U.S. 332, 340-45, 99 S.Ct. 1139, 1144-45, 59 L.Ed.2d 358 (1979). Furthermore, after reviewing specific provisions of the Florida statutes, we recently concluded that Florida's limited waiver of sovereign immunity was not intended to encompass section 1983 suits for damages. See Gamble, 779 F.2d at 1513-20.

Accordingly, in Zatler, the court found that the Secretary of the Florida Department of Corrections (FDOC) was immune from suit in his official capacity. Id. Thus, insofar as Plaintiff seeks monetary damages from Defendants in their official capacities, the Eleventh Amendment bars suit.

## C. Eighth Amendment Claim of Deliberate Indifference to Serious Medical Needs

As previously noted, Plaintiff claims that the Defendants violated his federal constitutional rights when they were

- 12 -

deliberately indifferent to his serious medical needs relating to the treatment of his right knee.  However, the record reflects that the Defendants were not deliberately indifferent to Plaintiff's serious medical needs.

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).  First, the plaintiff must satisfy the objective component by showing that he had a serious medical need.  Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)).  In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (citation and internal quotations marks omitted).

Brown, 387 F.3d at 1351.  Next, the plaintiff must satisfy the subjective component, which requires the plaintiff to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (setting forth the three components of deliberate indifference as "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk;

(3) by conduct that is more than mere negligence.") (citing <u>Farrow v. West</u>, 320 F.3d at 1245)).

> In <u>Estelle</u>[3], the Supreme Court established that "deliberate indifference" entails more than mere negligence. <u>Estelle</u>, 429 U.S. at 106, 97 S.Ct. 285; <u>Farmer</u>,[4] 511 U.S. at 835, 114 S.Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added). In interpreting <u>Farmer</u> and <u>Estelle</u>, this Court explained in <u>McElligott</u>[5] that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." <u>McElligott</u>, 182 F.3d at 1255; <u>Taylor</u>,[6] 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

<u>Farrow v. West</u>, 320 F.3d 1235, 1245-46 (11th Cir. 2003).

The United States Supreme Court has stated:

> [T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is

---

[3] <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).

[4] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

[5] <u>McElligott v. Foley</u>, 182 F.3d 1248 (11th Cir. 1999).

[6] <u>Taylor v. Adams</u>, 221 F.3d 1254 (11th Cir. 2000).

> indicated is a classic example of a matter for
> medical judgment.  A medical decision not to
> order an X-ray, or like measures, does not
> represent cruel and unusual punishment.  At
> most[,] it is medical malpractice, and as such
> the proper forum is the state court . . . .

Estelle, 429 U.S. at 107; Adams v. Poag, 61 F.3d 1537, 1545 (11th

Cir. 1995) ("[T]he question of whether [defendants] should have

employed additional diagnostic techniques or forms of treatment 'is

a classic example of a matter for medical judgment' and therefore

not an appropriate basis for grounding liability under the Eighth

Amendment."); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.

1991) ("Nor does a simple difference in medical opinion between the

prison's medical staff and the inmate as to the [inmate's]

diagnosis or course of treatment support a claim of cruel and

unusual punishment.").

    This Court finds that the Defendants have met their initial

burden of showing this Court that there are no genuine issues of

material fact that should be decided at trial (with respect to

Plaintiff's claim that Defendants Irsa and Reno were deliberately

indifferent to Plaintiff's serious medical needs).  Defendant Reno,

in her Declaration, avers that she followed all proper protocols

and procedures for the treatment of bacterial infections when she

treated Heiser on Friday, November 4, 2005.

> My name is Leticia Reno. I am a medical
> physician who has been licensed to practice in
> the State of Florida since 1985.  I was
> employed by the Florida Department of
> Corrections ("FDOC") as a physician at the

Reception and Medical Center ("RMC") of the FDOC for approximately 12 years.

In this declaration, I reference and incorporate true and correct copies of Mr. Heiser's medical records which are attached as exhibits to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

I have read the civil rights complaint filed by inmate Steven Heiser (FDOC# 100820) and I am aware of the claims he alleges against me. His claim that I was deliberately indifferent to the medical care of his right knee is absolutely untrue.

Specifically, Mr. Heiser alleges that I refused to evaluate or diagnose the basis of pain, redness, and swelling to his knee with respect to a surgical operation that was performed on the knee on October 24, 2005, that I insinuated there was nothing wrong with him, that I refused to follow post-operative instructions by not sending him to the emergency room for diagnosis and treatment, and that I merely provided him with some 200 mg Ibuprofen packets and nine (9) capsules of the antibiotic Keflex. However, Mr. Heiser's allegations are false.

Mr. Heiser was referred to me in the West Unit medical department on Friday, November 4, 2005, at approximately 1:15 p.m. after he declared a medical emergency while he was housed at the West Unit of the RMC. (Def. Ex. N.) During this medical consultation, I properly evaluated and diagnosed Mr. Heiser's condition based upon the best of my medical training, knowledge, and experience. Mr. Heiser's allegations otherwise are absolutely untrue. I am diligent in documenting my contacts, diagnoses, and orders regarding patients under my care.

During this consultation, I was presented with a right knee that underwent a surgical arthroscopic procedure on October 24, 2005, to

- 16 -

remove multiple loose bodies within the knee. (Def. Ex. K.) Mr. Heiser's knee demonstrated the following symptoms: redness, swelling, slightly stretched sutures (stitches), and no discharge from the sutures. (Def. Ex. N.) I properly reviewed Mr. Heiser's medical history and conducted an exam upon him.

Mr. Heiser's vital signs were within normal levels with no fever and his symptoms reflected the type of redness and stretching of the sutures associated with use and swelling following a surgical procedure on a lower extremity which could be a result of stress being placed on the extremities or a bacterial infection. (See id.)

To treat Mr. Heiser's symptoms, I prescribed 500 mg of Keflex twice a day for 10 days and 800 mg of Motrin three times a day for 2 weeks then twice a day with meals. (Id.) Keflex (a.k.a. Cefalexin) is a cephalosporin antibiotic used to treat a wide range of bacterial infections, including bone and joint infections. Motrin (a.k.a. Ibuprofen) is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat pain and inflammation. This Motrin that I prescribed (800 mg) was prescription strength. It was not the over-the-counter ("OTC") strength of 200 mg.

Additionally, Mr. Heiser indicates that, given his symptoms, I should have immediately transferred him to the Main Unit emergency room, which would have prevented a Methicillin-resistant Staphylococcus aureas ("MRSA") infection. However, medical procedures do not require that every infection must be presumed to be MRSA and necessitate a test to determine such. Other conventional antibiotics used to the [sic] treat an infection must be attempted first before a health practitioner can properly determine if the bacteria is indeed resistant to these antibiotics.

> In sum, I followed all proper protocols and procedures for the treatment of bacterial infections when I treated Mr. Heiser.

Reno's Declaration.

Moreover, Defendant Isra, in her Declaration, avers that she also followed all proper protocols and procedures for the treatment of bacterial infections when she treated Heiser on Sunday, November 6, 2005.

> My name is Paiboon Isra. I am a medical physician who has been licensed to practice in the State of Florida since 1982. I have been employed by the Florida Department of Corrections ("FDOC") as a physician for approximately 9 years. During the times discussed in this declaration, I was assigned to [the] Main Unit of the Reception and Medical Center ("RMC") of the FDOC.

> In this declaration, I reference and incorporate true and correct copies of Mr. Heiser's medical records which are attached as exhibits to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

> I have read the civil rights complaint filed by inmate Steven Heiser (FDOC# 100820) and I am aware of the claims he alleges against me. His claim that I was deliberately indifferent to the medical care of his right knee is absolutely untrue.

> Specifically, Mr. Heiser alleges that on or about Saturday, November 5, 2005, he was seen by a nurse at the West Unit of the RMC regarding pain, redness, and swelling in his knee who called me in the Main Unit emergency room and I indicated that I would not see him. Then, on or about Sunday, November 6, 2005, he was again seen by a nurse at the West Unit regarding similar symptoms who called me in the Main Unit emergency room and I only

provided him an injection of the antibiotic Rocephin.

I was the physician assigned to the Main Unit emergency room from 8:00 a.m. in the morning of Saturday, November 5, 2005, through 8:00 a.m. Sunday, November 6, 2005. As the physician assigned to the emergency room, I would never refuse to see a patient, and any allegations otherwise are absolutely false. I properly evaluate and diagnose each condition that is presented to me based upon the best of my medical training, knowledge, and experience. I am diligent in documenting my contacts, diagnoses, and orders regarding patients under my care.

Mr. Heiser's medical records do not demonstrate that he sought any medical assistance on Saturday, November 5, 2005. Instead, the records show that Mr. Heiser was seen only four times from Friday, November 4, 2005, through Sunday, November 6, 2005. Specifically, he was seen by a nurse at approximately 12:45 p.m. on Friday, November 4, 2005, seen by Dr. Leticia Reno at approximately 1:15 p.m. that same day, and seen a third time by a nurse at approximately 9:45 p.m. on Friday night, and then, seen by a nurse on Sunday, November 6, 2005, at approximately 6:45 a.m. (Def. Ex. N.)

The records show that, when Mr. Heiser was seen by a nurse on Friday night at the West Unit of the RMC, the nurse called the physician in the emergency room who prescribed 2-Tylenol #3 every 6 hours for 3 days in additional [sic] to the prior prescription ordered by Dr. Reno approximately 8 hours earlier (Motrin and Keflex). (Id.)

On Sunday, Mr. Heiser sought medical assistance at the West Unit and was assessed by a senior licensed practical nurse ("SLPN") who noted that he recently underwent a surgical arthroscopic procedure, he complained of severe pain, his knee was red and hot to the touch with minimal swelling, and that his

- 19 -

vital signs were within normal levels with no
fever. (<u>Id</u>.) Based upon the symptoms, the
nurse called me in the emergency room to
discuss her assessment of possible infection
within the joint of the knee. (<u>See</u> <u>id</u>.)

After discussing her assessment with me,
I determined that a stronger antibiotic should
be tried and prescribed a 1-gram injection of
the antibiotic Rocephin into a muscle of the
patient. (<u>See</u> <u>id</u>.) Rocephin (a.k.a.
Ceftriaxone) is a cephalosporin antibiotic
used to treat a broader range of Gram-positive
and Gram-negative bacteria and more types of
bacterial infections than Keflex.

Additionally, Mr. Heiser indicates that,
given his symptoms, I should have ordered that
he be immediately transferred to the Main Unit
emergency room, which would have prevented a
Methicillin-resistant Staphylococccus aureas
("MRSA") infection. However, medical
procedures do not require that every infection
must be presumed to be MRSA, and necessitate a
test to determine such. Other conventional
antibiotics used to the [sic] treat an
infection must be attempted first before a
health practitioner can properly determine if
the bacteria is indeed resistant to thee
antibiotics.

In sum, I followed all proper protocols
and procedures for the treatment of bacterial
infections when I treated Mr. Heiser.

Isra's Declaration.

While Heiser disagrees with the treatment provided to him by

Defendants Reno and Isra, he nevertheless fails to state a federal

constitutional claim of deliberate indifference. <u>See</u> <u>Estelle</u>, 429

U.S. at 107. Both Defendants provided proper medical care to

Heiser relating to his right knee pain experienced during the

relevant time period (Friday, November 4, 2005, through Sunday,

November 6, 2005).  The record reflects that, from November 4th through 6th, Heiser was seen four times for medical care relating to the pain in his right knee.  <u>See</u> Isra's Declaration; Def. Ex. N.

First, a nurse saw Heiser on Friday, November 4th, at approximately 12:40 p.m., referred him to a physician, and noted that Heiser had an orthopedic appointment on the following Monday, November 7th.  <u>See</u> Def. Ex. N.  Then, within less than one hour that same day, at approximately 1:15 p.m., Defendant Reno saw Heiser and prescribed 500 mg of Keflex (Cephalexin) twice a day for ten days and 800 mg (prescription strength, not the over-the-counter strength of 200 mg) of Motrin three times a day for two weeks, then twice a day with meals.  <u>See</u> Reno's Declaration; Def. Ex. N.  Next, that same day at 9:48 p.m., a nurse saw Heiser again and called the physician in the emergency room, who prescribed two Tylenol #3 every six hours for three days in addition to the prior prescriptions (Keflex and Motrin) that had been ordered by Defendant Reno approximately eight hours earlier.  Def. Ex. N.  Moreover, on Sunday, November 6, 2005, at 6:45 a.m., Senior Licensed Practical Nurse Hinson saw Heiser, consulted with Defendant Isra (who determined that a stronger antibiotic should be tried and therefore prescribed a 1-gram injection of the antibiotic Rocephin), and advised that Heiser should keep his follow-up orthopedic appointment for the following day, Monday, November 7th.  <u>See</u> Isra's Declaration; Def. Ex. N.

In support of their contention that they were not deliberately indifferent to Heiser's medical needs, Defendants rely upon the declaration of Dr. Ronald Solorzano-Pallais, M.D., a licensed medical doctor, an FDOC employee for over thirteen years, and the Regional Medical Executive Director for Region II of the FDOC. With oversight responsibility for the delivery of health services to inmates within Region II, which includes RMC, Dr. Solorzano-Pallais avers, in pertinent part:

> Mr. Heiser alleges that Dr. Leticia Reno and Dr. Paiboon Isra failed to follow proper procedural protocols relative to post-operative infections to his right knee, resulting in the infection mutating into Methicillin-resistant Staphylococcus aureus ("MRSA").

> MRSA is the type of bacterium which is resistant to conventional antibiotics, such as penicillins. Some of the symptoms and signs that could indicate that a bacterial infection is MRSA, are wounds that are producing pus, fever of 101 degrees Fahrenheit or greater, and lethargy.

> A bacterial infection is not presumed to be MRSA. The infection is treated empirically with conventional antibiotics, such as first-generation cephalosporins or amoxicillins, before more invasive methods are attempted, such as IV Vancomycin (antibiotic administered intravenously) or incision and drainage ("I & D") with irrigation. However, a bacterial infection cannot be treated initially with Vancomycin because it could be a Vancomycin-resistant strain, for example: Vancomycin-resistant Enterococcus ("VRE") or Vancomycin-resistant Staphylococcus aureus "VRSA"), both bacterial strains that are resistant to Vancomycin.

Consequently, after conventional antibiotics prove to be ineffective, a culture of the affected area is collected and tested to determine if the bacterium is resistant or sensitive to specific antibiotics. Sensitive means that the bacteria is susceptible to the antibiotic.

Incision and drainage ("I & D") is used when the infected area is below the surface, so an incision must be made to allow drainage and permit the affected area to be irrigated with normal saline solution (0.9% NaCl solution).

The FDOC's guidelines for management of MRSA provide more specific procedures for identifying, treating, and preventing MRSA. (Def. Ex. S) These guidelines are based on the procedures recommended by the Centers for Disease Control and Prevention ("CDC") and the Federal Bureau of Prisons ("BOP"). (See id.)

In Mr. Heiser's circumstance, he showed symptoms which correlate with post-operative swelling and possible infection. (Def. Ex. N) Given the redness and swelling of his knee, the antibiotic Keflex (a.k.a. Cephalexin) was prescribed, followed by Rocephin (a.k.a. Ceftriaxone). (Id.) Both of these antibiotics are cephalosporins which are used to treat conventional infections with Rocephin treating mores [sic] types of bacteria than Keflex.

After these conventional antibiotics were attempted, an incision and drainage ("I & D") was done, culture was taken from the knee, and tested to determine which antibiotics the bacterium is sensitive to, the affected area was then irrigated with normal saline solution (0.9% NaCl solution). (Def. Ex. O) In this case, the bacteria were sensitive to Linezolid (a.k.a. Zyvox) and Vancomycin. (Id.) However, the test of the culture did not determine if the bacterium was indeed sensitive to cephalosporins. (See id.)

> In sum, Dr. Reno and Dr. Isra followed
> all proper protocols and procedures for the
> treatment of bacterial infections when they
> each treated Mr. Heiser.

Solorzano-Pallais' Declaration.

Both Defendants as well as Dr. Solorzano-Pallais opine that medical procedures do not require that every infection must be presumed to be MRSA and necessitate a test to determine such.  See Solorzano-Pallais, Reno, and Isra's Declarations.  Rather, other conventional antibiotics used to treat an infection must be attempted first before a health practitioner can properly determine if the bacteria is indeed resistant to these antibiotics.  Then, after the conventional antibiotics are attempted and prove to be ineffective, a culture of the affected area is collected and tested to determine if the bacterium is resistant or sensitive to specific antibiotics.

Heiser showed symptoms correlating with post-operative swelling and possible infection.  See Def. Ex. N; Solorzano-Pallais' Declaration.  When presented with the redness and swelling of Heiser's knee and vital signs within normal limits, but no fever or discharge, Defendant Reno properly prescribed the antibiotic Keflex and prescription strength Motrin.  Dr. Isra was presented with similar symptoms as well as the fact that a first-generation cephalosporin (Keflex) had not addressed Heiser's symptoms.  Consequently, Defendant Isra prescribed a stronger antibiotic (Rocephin), which attacks more types of bacteria.  See id.  As

- 24 -

explained by Dr. Solorzano-Pallais, Heiser's symptoms would not have indicated that he was at risk of serious harm of developing a MRSA infection since he had normal vital signs and did <u>not</u> have a discharge and fever.   <u>See</u> Solorzano-Pallais' Declaration.

Following that weekend, on Monday, November 7th, Heiser had a post-surgical examination and consultation with Dr. Lord, who recommended an I & D.  Following Dr. Lord's examination, Heiser was taken to Jacksonville Memorial Hospital later that day for an I & D; a culture was taken and tested to determine which antibiotics the bacteria were sensitive to, and the affected area was then irrigated with a normal saline solution.   <u>See</u> Def. Ex. O.   The laboratory report showed that the bacteria were sensitive to Linezolid (Zyvox) and Vancomycin.   <u>Id</u>.  As asserted by Defendants Reno and Isra and as explained by Dr. Solorzano-Pallais, Defendants Reno and Isra followed all proper protocols and procedures for the treatment of bacterial infections when they each treated Heiser, especially when the medical records noted that Heiser had a follow-up appointment the following Monday on November 7th with Dr. Lord, who had performed Heiser's October 24, 2005 surgical arthroscopic procedure.

Because the Defendants have met this initial burden, Plaintiff is required to present his own documentation (affidavits, depositions, answers to interrogatories, admissions on file, etc.) to show that there is a genuine issue for trial.  Plaintiff has

failed to provide any medical evidence to support his claim that the Defendants were deliberately indifferent to his serious medical needs during the relevant time period.    In the Complaint and opposition to the summary judgment, Plaintiff acknowledges that he received medical attention from Defendants Reno and Isra.

While Heiser asserts that he received only 200 mg of Motrin and nine capsules of Keflex, see Heiser's Declaration at 3, the medical records reflect that Defendant Reno prescribed 500 mg of Keflex twice a day for ten days and 800 mg of Motrin (a prescription dosage).    See Reno's Declaration; Def. Ex. N. Moreover, the Chronological Record of Health Care reflects that, when the nurse saw Heiser on November 4, 2005, at 9:48 p.m., Heiser stated that he had taken two 800 mg of Motrin since 2:00 p.m. that day. See Def. Ex. N at 3.

Nevertheless, although Heiser contracted MRSA, he has not provided any competent evidence to rebut the Defendants' evidence, which establishes that Defendants Reno and Isra's actions do not constitute an Eighth Amendment violation.    Given Heiser's post-operative symptoms at that time, Defendants Reno and Isra followed the proper protocols and procedures for the treatment of bacterial infections.    Indeed, Heiser's "disagreement with the course of treatment" chosen by the medical providers "does not 'support a claim of cruel and unusual punishment.'" See Moots v. Sec'y, Dep't of Corr., 425 Fed.Appx. 857, 858 (11th Cir. 2011) (per curiam)

(quoting <u>Harris</u>, 941 F.2d at 1505) (not selected for publication in
the Federal Reporter).   Moreover, the medical records show that,
after the time period relevant in this case, Dr. Lord and Dr.
Kleinhans addressed Heiser's medical needs, which ultimately
resulted in a TKA on Heiser's right knee on November 16, 2006.[7]
Accordingly, this Court will grant Defendants Isra and Reno's
Motion for Summary Judgment with respect to Plaintiff's Eighth
Amendment claim of deliberate indifference to his serious medical
needs.

### D. Qualified Immunity

Defendants Isra and Reno contend that they are entitled to
qualified immunity.   Defendants' Motion for Summary Judgment at 23-
24.

> To receive qualified immunity, [a] public
> official must establish that he was engaged in
> a "discretionary function" at the time he
> committed the allegedly unlawful act.
> <u>Holloman ex. rel. Holloman v. Harland</u>, 370
> F.3d 1252, 1263-64 (11th Cir. 2004) . . . .
> If the official demonstrates that he was
> engaged in a discretionary function, the
> burden shifts to the plaintiff to prove that
> the official is not entitled to qualified
> immunity.   <u>Cottone v. Jenne</u>, 326 F.3d 1352,
> 1358 (11th Cir. 2003).   This requires
> plaintiff to satisfy the two-part test
> prescribed by the Supreme Court in <u>Saucier v.
> Katz</u>, 533 U.S. 194, 121 S.Ct. 2151, 150
> L.Ed.2d 272 (2001).   Under <u>Saucier</u>, a
> plaintiff must first show that the defendant

---

[7] Heiser fails to assert that Defendants Reno and Isra had any
involvement in allegedly delaying the "immediate physical therapy"
ordered by Dr. Kleinhans on July 9, 2007.   Complaint at 10.

> violated a constitutional right and then
> demonstrate that the constitutional right was
> clearly established at the time of the alleged
> wrongful act.  533 U.S. at 201, 121 S.Ct. at
> 2156.  If a court, after viewing all the
> evidence in the light most favorable to the
> plaintiff and drawing all inferences in his
> favor, determines that the plaintiff has
> satisfied these two requirements, the
> defendant may not obtain qualified immunity.
> Holloman, 370 F.3d at 1264.

Bryant v. Jones, 575 F.3d 1281, 1295 (11th Cir. 2009), cert.

denied, 130 S.Ct. 1536 (2010).  Following the United States Supreme

Court's decision in Pearson v. Callahan, 129 S.Ct. 808, 815-16

(2009), this Court is "free to consider these elements in either

sequence and to decide the case on the basis of either element that

is not demonstrated."  Youmans v. Gagnon, 626 F.3d 557, 562 (11th

Cir. 2010).

It is undisputed that Defendants were engaged in discretionary

functions during the events in question.  Defendants did not

violate Plaintiff's constitutional rights and are therefore

entitled to qualified immunity.

### E. Defendant Thayer

Plaintiff names Defendant James Scott Thayer, M.D. as a

Defendant in this action.  Service of process was returned

unexecuted for Defendant Thayer because he passed away on October

13, 2009.  See Return of Service (Doc. #28), filed June 23, 2010.

This Court, on November 15, 2010, notified Heiser that Defendant

Thayer had passed away.  See Order (Doc. #30).  Since Plaintiff

never filed a motion for substitution after Thayer's death was noted on the record, <u>see</u> Fed. R. Civ. P. 25(a)(1),[8] this Court will dismiss Defendant Thayer from this action.

Moreover, the Prison Litigation Reform Act requires the Court to dismiss this case at any time if the Court determines that the action is frivolous, malicious, fails to state a claim upon which relief can be granted or seeks monetary relief against a defendant who is immune from such relief. <u>See</u> 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). "A claim is frivolous if it is without arguable merit either in law or fact." <u>Bilal v. Driver</u>, 251 F.3d 1346, 1349 (11th Cir.) (citing <u>Battle v. Central State Hospital</u>, 898 F.2d 126, 129 (11th Cir. 1990)), <u>cert</u>. <u>denied</u>, 534 U.S. 1044 (2001). A complaint filed <u>in</u> <u>forma</u> <u>pauperis</u> which fails to state a claim under Fed.R.Civ.P. 12(b)(6) is not automatically frivolous. <u>Neitzke v. Williams</u>, 490 U.S. 319, 328 (1989). Section 1915(e)(2)(B)(i) dismissals should only be ordered when the legal theories are "indisputably meritless," <u>id</u>. at 327, or when the claims rely on factual allegations which are "clearly baseless." <u>Denton v. Hernandez</u>, 504 U.S. 25, 32 (1992). "Frivolous claims include claims 'describing fantastic or delusional scenarios, claims with which federal district judges are all too familiar.'" <u>Bilal</u>, 251 F.3d at 1349 (quoting <u>Neitzke</u>, 490 U.S. at 328). Additionally, a

---

[8] <u>See</u> Fed. R. Civ. P. 25(a)(1) ("If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.").

claim may be dismissed as frivolous when it appears that a plaintiff has little or no chance of success. Bilal v. Driver, 251 F.3d at 1349.

Nevertheless, in considering Plaintiff's claims under 28 U.S.C. § 1915, the Court must read his pro se allegations in a liberal fashion. Haines v. Kerner, 404 U.S. 519 (1972). Here, after reviewing Plaintiff's allegations and exhibits concerning Defendant Thayer, see Complaint at 12; P. Exs. V; X, this Court opines that Heiser's claim relating to Thayer may be dismissed as frivolous since it appears that Heiser has little or no chance of success. Indeed, Plaintiff presents nothing other than his assumption that Thayer played any role in his medical treatment. Therefore, in the alternative, Heiser's action against Defendant Thayer will be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

## F. Conclusion

This Court finds that Defendants Reno and Isra have met their initial burden of showing, by reference to affidavits and other documentary evidence, that there are no genuine issues of material fact that should be decided at trial with respect to Plaintiff's claims against them. Defendants have presented evidence that they appropriately addressed Plaintiff's medical needs and were not deliberately indifferent to those needs. Given the strong and consistent statements of the Defendants as well as Dr. Solorzano-Pallais, who reviewed Heiser's medical records, and the lack of any

other factual evidence to support Plaintiff's claims, this is the type of case as to which summary judgment is appropriate.  <u>See Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (stating "a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment").  Thus, this Court concludes that no reasonable jury could believe, based upon the evidence of record, that Defendants Reno and Isra were deliberately indifferent to Plaintiff's serious medical needs.

Under these circumstances, the undersigned concludes that there are no disputed facts to be tried by a jury and that summary judgment in favor of Defendants Reno and Isra is due to be entered. Accordingly, Defendants Isra and Reno's Motion for Summary Judgment (Doc. #41) will be granted, and judgment will be entered in their favor.  Moreover, this Court will dismiss Defendant Thayer from this action pursuant to Fed. R. Civ. P. 25(a)(1), and in the alternative, Heiser's claim against Defendant Thayer will be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B).

Therefore, it is now

**ORDERED:**

1.   Defendants Isra and Reno's Motion for Summary Judgment (Doc. #41) is **GRANTED.**

2.   The Clerk shall enter final judgment in favor of Defendants Isra and Reno.

- 31 -

3.    Defendant Thayer is **DISMISSED** from this action pursuant to Fed. R. Civ. P. 25(a)(1), and in the alternative, Plaintiff's claim against Defendant Thayer is **DISMISSED** as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B).

4.    The Clerk of Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 7th day of February, 2012.


MARCIA MORALES HOWARD
United States District Judge


sc 2/7
c:
Steven C. Heiser
Counsel of Record

- 32 -